UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

Plaintiff,

vs.

Melanie Frances Bedeau,
a/k/a "Melanie Frances Seigel,"

Defendant.                Crim. No. 07-299 (DSD/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I.  <u>Introduction</u>

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Motions of the Defendant Melanie Frances Bedeau:

1.      Motion to Suppress Statements, Admissions, and
        Answers [Docket No. 19].

2.      Motion to Suppress Evidence [Docket No. 21].

A Hearing on the Motions was conducted on October 1, 2007,[1] at which time, the Defendant appeared personally, and by Reynaldo A. Aligada, Jr., and Caroline Durham, Assistant Federal Defenders, and the Government appeared by James E. Lackner, Assistant United States Attorney.  For reasons which follow, we recommend that the Defendant's Motions be denied.

## II.  Factual Background

The Defendant is charged with one (1) Count of Murder in the Second Degree, in violation of Title 18 U.S.C. §§1111, 1151, and 1153(a); and two (2) Counts of Assault Resulting in Serious Bodily Injury, in violation of Title 18 U.S.C. §§113(a) (6), 1151, 1153(a).  The events which gave rise to those charges are alleged to have taken place on May 2, 2007, in this State and District.  As pertinent to those charges, and to the Motion now before us, the operative facts may be briefly summarized.[2]

---

[1]At the close of the Hearing, the parties requested leave to submit post-Hearing memoranda on the legal issues raised by the Defendant's Motions.  Leave was granted, and the last submission on the issues was received on October 16, 2007, at which time, the Motions were taken under advisement.  See, Title 18 U.S.C. §3161(h) (1)(F) and (J); Henderson v. United States, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 676-77 (8th Cir. 1995).

[2]Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record."  See, United States v. Santiago, 410 F.3d 193, 198 (5th Cir. 2005), cert. denied, 126 S.Ct. 1565 (2006).  As augmented by our recitation of factual findings in

- 2 -

At the Hearing, William Branchaud Jr. ("Branchaud"), who is a police officer, and acting Sergeant with the Red Lake Department of Public Safety, testified at the instance of the Government.[3]  According to Branchaud, he was on duty on the evening of May 2, 2007, when Red Lake dispatchers received two (2) separate calls, which reported a disturbance at the residence of Karen Bedeau ("Karen"), who is the Defendant's sister.  The first call was received at approximately 11:00 o'clock p.m. The second call was received when Branchaud and his partner, Jason Defoe, who is a canine officer with the Red Lake Department of Public Safety, were already en route to Karen's residence, which is located on the Red Lake Indian Reservation, in response to the first call.  When Branchaud arrived at the residence, he pulled into the driveway, and observed Karen and another woman, who was identified as Angela Joy Brown ("Angela"), lying on the ground near the driveway.  Several other women were standing over Karen and Angela, and Branchaud observed that Angela was covered

---

our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.  Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require.  See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

[3]Branchaud positively identified the Defendant at the Suppression Hearing.

in dirt and grass. Branchaud returned briefly to his squad car in order to call for an ambulance. He then checked Angela for a pulse, but found none. Angela was subsequently pronounced dead at the scene. Branchaud observed that Karen was in pain, but was responsive.

Branchaud testified that, when he arrived at the scene, he saw a white pickup truck (the "truck") approximately 20 feet south of the driveway, with its engine running. Branchaud also observed tracks leading from the truck to Angela's body. Branchaud called dispatch with a description of the truck, which was later determined to be registered to the Defendant.

Branchaud testified that, while he was attempting to secure the scene, Alison Brown ("Alison"), who is Angela's sister, followed him, as did several other unidentified women. Alison and the other women began shouting that the Defendant had been driving the truck. Branchaud then arrested the Defendant, who was present at the scene, as well as Leland Richey ("Richey"), who was with the Defendant, and was covered in blood. The Defendant, and Richey, were searched incident to the arrest, handcuffed, and placed in Branchaud's squad car. Branchaud stated that, at the time of her arrest, the Defendant smelled strongly of alcohol, and had slurred speech. Branchaud testified, and at the Hearing, the Defendant stipulated, that, at that

- 4 -

time, Branchaud administered <u>Miranda</u> warnings to both the Defendant and Richey. Branchaud stated that the Defendant immediately invoked her right to counsel, and that he asked her no questions. Instead, he shut the door on his squad car, leaving the Defendant and Richey in it, and turned his attention to securing the scene.

Branchaud then testified that Guadulupe Ybarra ("Ybarra"), another officer with the Red Lake Department of Public Safety, arrived at the scene to lend assistance. Branchaud asked Ybarra to transport the Defendant and Richey to the Red Lake Detention Center. Branchaud stated that, due to the number of people arriving on the scene, he was concerned for the safety of the Defendant.

Ybarra also testified at the Hearing, at the instance of the Government. Ybarra testified that, some time after she arrived at Karen's residence, Branchaud asked her to transport the Defendant, and Richey, to the Red Lake Detention Center, in Branchaud's squad car. Ybarra stated that she did not observe any questions being asked of the Defendant, while at Karen's residence. Ybarra testified that she could not recall whether the Defendant was handcuffed while in the squad car, but she acknowledged that the Defendant was in custody. Ybarra testified that she was alone in the squad car, with the Defendant and Richey in the backseat, during the transport. Ybarra could hear the Defendant and Richey talking to each other, though she could

not understand what they were saying.  Richey then began raising his voice, telling the Defendant, "Look at me when I'm talking to you."

Ybarra testified that, at that point, she told Richey to settle down, because she was concerned that he was becoming angry.  Then, after the Defendant and Richey began talking to each other again, Ybarra heard the Defendant raise her voice to Richey, stating, "You look like that because they piled us, they piled us."  Ybarra stated that the remainder of the transport was quiet, and testified that, if the Defendant and Richey were speaking to each other, she could not hear them.  Ybarra testified that she did not ask the Defendant, or Richey, any questions during the transport.  The uncontradicted Record reflects that the statements by the Defendant and Richey were spontaneous, and that Ybarra did not attempt to elicit any information from the Defendant.

Ybarra further testified that, when they arrived at the Red Lake Detention Center, the Defendant was booked, and read her Miranda rights.  Ybarra testified that the Defendant said she understood her rights, but that she would not sign the waiver form. Ybarra did not recall if the Defendant invoked her right to counsel at that time.  Ybarra testified that she did not ask the Defendant any questions at the Detention Center, where the Defendant was searched, and placed in a cell.

In his testimony, Branchaud testified that, after turning the scene over to the criminal investigators from the Red Lake Department of Public Safety, he returned to the Police station in the early morning hours of May 3, 2007. Branchaud then drafted a Search Warrant Application, and supporting Affidavit, in order to obtain a blood sample from the Defendant. At the Hearing, the Government proffered Exhibit 1 to the Court, which was comprised of a Search Warrant and supporting Affidavit, dated May 3, 2007, that was filed in the Red Lake Court of Indian Offenses. Without objection from the Defendant, the Exhibit was admitted. The Search Warrant authorized Branchaud, or another Red Lake Police Officer, to draw a blood sample from the Defendant, in order to determine whether she was under the influence of alcohol, or drugs, at the time of the incident.

Branchaud also testified that a Tribal Code Rule required the execution of any Warrant within ten (10) days of authorization. Branchaud acknowledged, however, that the Warrant stated that the blood sample must be taken before March 12, 2007. Branchaud stated that the date was a typographical error, and that, under the Tribal Code Rule, he would have had ten (10) days -- until May 13, 2007 -- to execute the Warrant. Branchaud testified that he intended to execute the Search Warrant immediately, since time was of the essence in order to determine if the Defendant was

under the influence of any alcohol or drugs. According to Branchaud, the Tribal Court Judge was aware of his intent to immediately execute the Search Warrant.

Branchaud stated that he submitted the Search Warrant Application, and supporting Affidavit, to a Tribal Court Judge in the early morning of May 3, 2007, and that the Judge signed, and returned the Warrant by fax, shortly thereafter. Branchaud then drove to the Red Lake Hospital, where he met the Defendant at approximately 1:45 o'clock a.m. The Defendant had been transported to the hospital by another officer. Branchaud first asked the Defendant to sign a written consent form for the blood sample. As related by Branchaud, he asked the Defendant for her consent, even though he had already obtained the Search Warrant, because he believed the procedure would be safer, for all involved, if the Defendant was cooperative, rather than resistant. Branchaud testified that the Defendant initially agreed to sign the consent form, but then changed her mind, stating that she had smoked some marijuana that evening.

Branchaud then showed the Defendant the Search Warrant, and explained that he was authorized to take the blood sample without her consent. As recounted by Branchaud, the Defendant then stated that she wanted her lawyer to see the Search Warrant. When Branchaud inquired as to when the Defendant's lawyer would arrive, she responded that her lawyer was in California. Branchaud explained to the

Defendant that time was of the essence to take the blood sample, and that they could not wait for her lawyer to arrive from California. The Defendant again declined to sign the consent form, and a blood sample was taken, pursuant to the Search Warrant, without incident.

Branchaud testified that, during the course of his conversation with the Defendant at the hospital, the Defendant spontaneously mentioned an "SKS" to him.[4] The SKS, Branchaud averred, was a weapon that was stolen from the Defendant's vehicle, some time before May 2, 2007. The Defendant reported the theft to another Red Lake Police Officer, though Branchaud testified that he was generally aware of the stolen weapon, prior to the night of May 2, 2007. Branchaud also stated that he was surprised that the Defendant mentioned the SKS, since they had not been talking about it. Again, the Record reflects that the Defendant mentioned the SKS without any elicitation by Branchaud. Branchaud testified, however, that he then asked the Defendant why she had mentioned the stolen weapon. Branchaud testified that the Defendant then made a motion toward her head, as if to mimic shooting herself. Branchaud stated that he believed the Defendant was "guilt-ridden" at the hospital, and

_____

[4]The precise wording of this statement, by the Defendant, was not introduced at the Suppression Hearing, and is not included in the Record before us.

- 9 -

stated that she was crying, hanging her head, and reluctant to speak to him.  On cross-examination, Branchaud stated that he did not re-administer <u>Miranda</u> warnings to the Defendant while at the hospital.

III.  <u>Discussion</u>

In her Motion to Suppress Statements, the Defendant asks that we suppress any statements, or nonverbal responses, that she made in response to police questioning. In her Motion to Suppress Evidence, the Defendant asks that we review the Search Warrant and Affidavit, which authorized the taking of a blood sample, in order to determine whether the Warrant was supported by probable cause, or contained other fatal defects.  We address each of her Motions in turn.

A.    <u>The Defendant's Statements</u>.

1.    <u>Standard of Review</u>.  Government agents are not required to administer <u>Miranda</u> warnings to everyone they question.  See, <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977).  Rather, <u>Miranda</u> warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'"  <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994), quoting <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966); <u>United States v. Helmel</u>, 769 F.2d 1306, 1320 (8th Cir. 1985); <u>Berkemer v. McCarty</u>, 468 U.S. 420,

- 10 -

428-29 (1984).  Once a suspect is in police custody and subject to interrogation, the suspect must be informed of his constitutional right to remain silent, and to be represented by legal counsel during questioning.  See, Miranda v. Arizona, supra at 473; see also, Dormire v. Wilkinson, 249 F.3d 801, 804 (8th Cir. 2001), cert. denied, 534 U.S. 962 (2001).

"The right to counsel recognized in Miranda is sufficiently important to suspects in criminal investigations, * * * that it 'requir[es] the special protection of the knowing and intelligent waiver standard.'"  Davis v. United States, 512 U.S. 452, 458 (1994); see also, United States v. Ortiz, 315 F.3d 873, 885 (8th Cir. 2002), cert. denied, 538 U.S. 1042 (2003).  Nevertheless, "[i]f the suspect effectively waives his right to counsel after receiving the Miranda warnings, law enforcement officers are free to question him."  Id., citing North Carolina v. Butler, 441 U.S. 369, 372-376 (1979); see also, United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994); see also, United State v. Valdez, 146 F.3d 547, 551 (8th Cir. 1998), cert. denied, 525 U.S. 938 (1998)("Once an accused requests counsel, no further interrogation may take place until counsel has been made available or 'unless the accused himself initiates further communication, exchanges, or conversations with the police.'"), quoting Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).

The burden rests with the Government to prove, by a preponderance of the evidence, that the Defendant knowingly and voluntarily waived his Miranda rights. See, Colorado v. Connelly, 479 U.S. 157, 168 (1986); United States v. Dougherty, 810 F.2d 763, 773 (8th Cir. 1987).  However, "Miranda has no application to statements * * * that are voluntarily offered and are not a product of either express questioning or any police practice reasonably likely to evoke an incriminating response."  United States v. Griffin, 922 F.2d 1343, 1357 (8th Cir. 1990), citing United States v. McGauley, 786 F.2d 888, 891 (8th Cir. 1986), and United States v. Webster, 769 F.2d 487, 492 (8th Cir. 1985).

Indeed, our Court of Appeals has "'repeatedly held that "[a] voluntary statement made by a suspect, not in response to interrogation, is not barred [by the Fifth Amendment] and is admissible with or without the giving of Miranda warnings."'"  United States v. Turner, 157 F.3d 552, 556 (8th Cir. 1998), quoting United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995), cert. denied, 516 U.S. 1150 (1996), quoting, in turn, Rhode Island v. Innis, 446 U.S. 291, 299 (1980); United States v. Cunningham, 133 F.3d 1070, 1074 (8th Cir. 1998), cert. denied, 523 U.S. 1131 (1998)(where officers merely listen to suspect, nothing prohibits use of suspect's statements against him); United States v. Hayes, 120 F.3d 739, 744 (8th Cir.

- 12 -

1997)("'Miranda does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers.'"), quoting United States v. Hawkins, 102 F.3d 973, 975 (8th Cir. 1996), cert. denied, 520 U.S. 1179 (1997), citing, in turn, Butzin v. Wood, 886 F.2d 1016, 1018 (8th Cir. 1989), cert. denied, 496 U.S. 909 (1990); United States v. Kalter, 5 F.3d 1166, 1168-69 (8th Cir. 1993)(Miranda does not require suppression of spontaneous utterances which are not the product of interrogation); United States v. Waloke, 962 F.2d 824, 828-29 (8th Cir. 1992) (suspect's spontaneous statements, while in transit to a detention center, were voluntary, were not the product of interrogation, and did not require the administration of a Miranda warning).

Further, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination. See, Dickerson v. United States, 530 U.S. 428, 433-34 (2000). For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." Dickerson v. United States, supra at 434, citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

As the Supreme Court has explained:

> The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." [Schneckloth v. Bustamonte, 412 U.S. at 226.]  See also Haynes [v. Washington, 373 U.S. 503, 513] (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, [324 U.S. 401, 404] (1945)("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant").  The determination "depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." Stein v. New York, [346 U.S. 156, 185] (1953).

Id. at 434.

Among the circumstances, which are to be considered in this analysis are, first and foremost, whether a Miranda warning has been given, see, Withrow v. Williams, 507 U.S. 680, 693 (1993); any elements of "police coercion," see, Colorado v. Connelly, supra at 167; the length of the interrogation, see, Ashcraft v. Tennessee, 322 U.S. 143, 153-154 (1944); the location of the interrogation, see, Reck v. Pate, 367 U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, Leyra v. Denno, 347 U.S. 556, 561 (1954).  See also, Withrow v. Williams, supra at 693 (listing the applicable considerations).

2.  <u>Legal Analysis</u>.  Here, all agree that, at the time of her arrest on May 2, 2007, the Defendant was in official custody.  The Record demonstrates that the Defendant had been administered a <u>Miranda</u> warning on May 2, 2007, by Branchaud, at the scene of Karen's residence, and by Ybarra, at the Detention Center. The Defendant invoked her right to counsel twice, after each <u>Miranda</u> warning.  We must consider then whether her statements were spontaneous, rather than in response to any interrogation.

a.  <u>The Defendant's Statements during Transport</u>.  The Record demonstrates, beyond cavil, that the statements the Defendant made during her transport were unsolicited, were spontaneous, and were not in response to any interrogation, or the functional equivalent of interrogation.  Accordingly, the statements made by the Defendant, during her transport, were not obtained in violation of <u>Miranda</u>.  See, <u>United States v. Hatten</u>, supra at 262 ("We have repeatedly held that '[a] voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment, and is admissible with or without the giving of <u>Miranda</u> warnings.'"), quoting <u>Rhode Island v. Innis</u>, supra at 299; see also, <u>United States v. Cody</u>, 114 F.3d 772, 775 (8th Cir. 1997)(finding spontaneous statements made after the invocation of the right to silence admissible).          b   .

The Defendant's Statements at the Hospital.  As to the Defendant's interactions with Branchaud at the hospital, we find that the Defendant's initial statement to Branchaud, in which she mentioned her stolen gun, was spontaneous.  In his questions to the Defendant at the hospital, Branchaud sought only to obtain the Defendant's cooperation with the blood draw, so as to ensure the safety of all involved.  Although the Defendant had previously invoked her right to counsel, that invocation did not preclude Branchaud from seeking her consent to the blood sample.  See, United States v. Knight, 58 F.3d 393, 397 (8th Cir. 1995), cert. denied, 516 U.S. 1099 (1996)("[T]he Fifth Amendment's protection against self-incriminating statements may limit further interrogation once a person in custody invokes his right to counsel, but there is no similar prohibition on securing a voluntary consent to search for physical evidence."); see also, United States v. Bradley, 234 F.3d 363, 366 (8th Cir. 2000)(whether Police administered Miranda warnings is a factor for determining whether a defendant's later consent to search was voluntary); Boyer v. United States, 988 F.2d 56, 57 (8th Cir. 1993)(concluding that the defendant voluntarily consented to search, after receiving Miranda warning and invoking the right to remain silent).  Those questions did not

amount to an interrogation, and the Defendant's initial statement about the stolen gun was not in response to any of Branchaud's questions.[5]

After the Defendant's initial statement about the weapon, Branchaud asked the Defendant why she had mentioned her stolen gun. The Defendant responded by gesturing toward her head, as if to shoot herself.[6] In its Memorandum, the Government asserts that it intends to use that nonverbal response at Trial, and it describes the Defendant's gesture as "an acknowledgment of the situation and her

---

[5]The Government has not represented that it intends to use the Defendant's statement at Trial, that she had smoked marijuana earlier that evening, nor is it clear that the Defendant seeks to suppress that statement by her Motion. Nonetheless, we conclude that the Defendant's statement in that respect was also spontaneous, and was not in response to any interrogation by Branchaud. As noted, Branchaud was permitted to ask for the Defendant's consent for the blood sample, and such questions were not intended to elicit an admission of drug use. The Defendant could have declined to consent, without elaboration. We conclude, therefore, that the Defendant's statement was spontaneous. See, United States v. Hatten, 68 F.3d 257, 262 (8th Cir. 1995), cert. denied, 516 U.S. 1150 (1996)(holding that a voluntary statement by a suspect is not barred by the Fifth Amendment).

[6]In its Memorandum, the Government also asserts that, in response to Branchaud's follow-up question, and contemporaneous with her gesture, the Defendant stated "I wish I had it now," or "I wish I had it right now." Government's Memorandum in Opposition, Docket No. 27, at 2, 3, and 6. At the Suppression Hearing, no evidence of that second statement was introduced by either party. Nevertheless, if the Defendant made such a statement, we conclude that it would be subject to the same analysis as her gesture, as more fully detailed in the text of this Opinion.

- 17 -

guilt."[7]  See, Government's Memorandum in Opposition, supra at 6.  The Defendant contends that Branchaud questioned the Defendant because he believed that she appeared "guilt ridden," and further urges that Branchaud's question to the Defendant was the functional equivalent of interrogation, which elicited the Defendant's gesture, in violation of her Miranda rights.  See, Defendant's Memorandum in Support, supra at 7.

The issue devolves then to whether Branchaud's question was designed to elicit an incriminating response so as to constitute official interrogation.  See, Rhode Island v. Innis, supra at 300 (holding that "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent," and that interrogation did not only refer "to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.").

---

[7]The Government does not contest the Defendant's assertion, that this type of nonverbal response can be testimonial, and therefore, can be within the protections of the Fifth Amendment.  See, Defendant's Memorandum in Support, Docket No. 26, at 3-4; see also, Schmerber v. California, 384 U.S. 757, 761 n. 5 (1966)("A nod or headshake is as much a 'testimonial' or 'communicative' act * * * as are spoken words.").

In Rhode Island v. Innis, supra at 301, the Supreme Court instructed Courts that, when considering whether a law enforcement officer's words, or acts, were such that the officer should have known that they were reasonably likely to elicit an incriminating response, the focus should be "primarily upon the perception of the suspect, rather than the intent of the police," because "Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police."   However, the Supreme Court also noted that, "since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response."   Id.   Thus, the question turns on whether the single question by Branchaud would have been perceived as interrogation by a reasonable person under the circumstances then confronting the Defendant.   See, Holman v. Kemna, 212 F.3d 413, 420 (8th Cir. 2000), cert. denied, 531 U.S. 1021 (2000).

Necessarily, our analysis is case-specific for, "[d]etermining whether particular statements or practices amount to interrogation depends on the circumstances of each case, particularly whether the statements are objectively and reasonably likely to result

- 19 -

in incriminating responses by the suspect, as well as the nature of the police statements and the context in which they are given." United States v. Allen, 247 F.3d 741, 765 (8th Cir. 2001), rev'd on other grounds, 536 U.S. 953 (2002).

Here, Branchaud testified that he had not previously mentioned the stolen gun to the Defendant, and that he was understandably surprised by her unsolicited statement.[8]  Given the totality of the circumstances, we are unable to conclude that Branchaud's single question amounted to interrogation.  See, United States v. Fleck, 413 F.3d 883, 893 n. 2 (8th Cir. 2005)("Though the officers asked a direct question of the [defendants] * * * it was not the kind of investigative questioning -- intended to elicit an incriminating response -- that was at issue in Miranda."); United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005)("An officer's request for clarification of a

---

[8]There is no suggestion by the Government that Branchaud's question about the stolen gun was prompted by a concern for public safety.  See, New York v. Quarles, 467 U.S. 649, 656 (1984).  Under the "public safety" exception, an officer may question a suspect concerning matters "necessary to secure their own safety or the safety of the public," without administering a Miranda warning.  Id. at 659.  Nor is there any intimation that Branchaud's question was intended to evoke a response that would expose the Defendant to criminal prosecution, or penalty, for her acknowledged possession, at one time, of the SKS.  According to the Record, here, the Defendant had previously reported, to law enforcement, that the SKS was taken from her possession, so her statement at the hospital did not disclose any information that law enforcement had not previously known.

spontaneous statement generally does not constitute interrogation."); United States v. Koontz, 143 F.3d 408, 411 (8th Cir. 1998)("[F]or Miranda purposes, statements made in response to a law enforcement officer's 'attempt to seek clarification' of a defendant's remarks, during an interview requested by the defendant, are not the 'products of interrogation.'").

Though Branchaud's question was not one "normally attendant to arrest and custody," see, United States v. Lockett, 393 F.3d 834, 838 (8th Cir. 2005), cert. denied, 546 U.S. 1198 (2006), quoting Rhode Island v. Innis, supra at 301, there is nothing in the Record that demonstrates a link between the stolen weapon, and the incident of May 2, 2007, such that Branchaud's question was designed to elicit information that related to the Defendant's alleged crime. Indeed, the incidents appear wholly unrelated, since the Defendant was the victim of the gun theft and is, by contrast, the alleged perpetrator of the vehicular offense.

We conclude, therefore, that Branchaud could not have known that his words or actions were "reasonably likely to elicit an incriminating response from a suspect." United States v. Mendoza-Gonzalez, 363 F.3d 788, 795 (8th Cir. 2004), citing Rhode Island v. Innis, supra at 301; see also, United States v. Hawkins, supra at 975 (finding that an officer had no reason to know that his brief exchange with the defendant was

likely to elicit an incriminating response, when the exchange was prompted by the defendant's spontaneous statements); United States v. Mendoza-Gonzalez, supra at 795 (concluding that an officer "could not reasonably have expected [the defendant] to make an incriminating statement in response to simply being asked why he wanted to use the phone."). Nor would a reasonable person have perceived the question as interrogation, under the circumstances presented. See, Holman v. Kemna, supra at 418; United States v. Criswell, 696 F.2d 636, 638-39 (8th Cir. 1982). We find no responsible basis upon which a reasonable person, in the Defendant's position, would have understood Branchaud to be asking for information related to the incident at Karen's residence. Accordingly, we conclude that the Defendant's Miranda rights were not violated.[9]

We further find that, in response to Branchaud's question, the Defendant made a voluntary, spontaneous admission, in the form of her responsive gesture, which is not barred by the Fifth Amendment. See, United States v. Turner, supra at 556 ("[A]

---

[9]Since we conclude that Branchaud's question did not amount to interrogation, we need not consider the Government's alternative argument, that the Defendant voluntarily waived her Miranda rights, and thereby agreed to interrogation, by initiating the conversation with Branchaud at the hospital. See, Government's Memorandum in Opposition, supra at 5-6; Defendant's Memorandum in Support, supra at 6-7.

voluntary statement made by a suspect, not in response to interrogation, is not barred [by the Fifth Amendment] and is admissible with or without the giving of <u>Miranda</u> warnings.'"), quoting <u>United States v. Hatten</u>, supra at 261, quoting, in turn, <u>Rhode Island v. Innis</u>, supra at 299.   Indeed, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of <u>Miranda</u> are rare." <u>United States v. Astello</u>, 241 F.3d 965, 966 (8th Cir. 2001), cert. denied, 533 U.S. 962 (2001), quoting <u>Berkemer v. McCarty</u>, supra at 433; see, <u>United States v. Pierce</u>, 152 F.3d 808, 813 (8th Cir. 1998).   While the personal characteristics of a suspect, such as her age, mental capacity, and intoxication, are pertinent to a determination of voluntariness, see, <u>United States v. Makes Room</u>, 49 F.3d 410, 415 (8th Cir. 2005), coercive police conduct is a "necessary predicate" to finding a statement involuntary. <u>Colorado v. Connelly</u>, supra at 167; <u>Thatsaphone v. Weber</u>, 137 F.3d 1041, 1046-1047 (8th Cir. 1998), cert. denied, 523 U.S. 1130 (1998).

Although Branchaud was undeniably aware that the Defendant might be under the influence of drugs, alcohol, or both -- indeed, that was the purpose of her presence at the hospital -- the Defendant's intoxication, alone, would not render her response involuntary, on this Record.  See, <u>United States v. Turner</u>, supra at 555 (concluding

that even if the defendant was intoxicated at the time of his confession, circumstances indicated that he was aware of his rights and made a knowing waiver); United States v. Makes Room, supra at 415 ("We have repeatedly declined to adopt a per se rule of involuntariness when confronted with intoxication and/or fatigue, and we decline to do so now."). Instead, the test is whether the defendant's intoxication "caused the defendant's will to be overborne." United States v. Annis, 446 F.3d 852, 856 (8th Cir. 2006), cert. denied, --- U.S. ---, 127 S.Ct. 3044 (2007), quoting United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990), cert. denied, 499 U.S. 941 (1991).

Here, there is no evidence that the Defendant was unable to comprehend the nature of her interaction with Branchaud, due to her level of intoxication. Indeed, just prior to the exchange between Branchaud and the Defendant, she had been able to ask that her lawyer be able to review the Search Warrant, thereby demonstrating that she was aware of the potential consequences of her arrest, as well as the Search Warrant. She had also declined to sign a consent form for the blood sample and, earlier in the evening, the Defendant had twice demonstrated an understanding of her right to demand an attorney. The Defendant has not presented any evidence of coercion, whether direct or circumstantial, that would otherwise demonstrate an overborne will, her exchange with Branchaud was brief, and there is no evidence that Branchaud made

any threats or promises to induce the Defendant's statements.   As a result, we conclude that the Defendant's response to Branchaud's question was voluntary, and not the product of any interrogation.   Accordingly, we recommend that the Defendant's Motion to Suppress Evidence be denied in its entirety.

      B.     The Search Warrant.

      1.     Standard of Review. In the issuance of a Search Warrant, the Fourth Amendment dictates that an impartial, neutral, and detached Judicial Officer, will assess the underlying factual circumstances so as to ascertain whether probable cause exists to conduct a search, or to seize incriminating evidence, the instrumentalities or fruits of a crime, or contraband.  See, Warden v. Hayden, 387 U.S. 294 (1967); United States v. Johnson, 64 F.3d 1120, 1126 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996).  In order to find probable cause, it must be demonstrated that, in light of all the circumstances set forth in the supporting Affidavit, there is a fair probability that contraband, or evidence of a crime, will be found in a particular, designated place.  See, United States v. Gladney, 48 F.3d 309, 313 (8th Cir. 1995); United States v. Tagbering, 985 F.2d 946, 949 (8th Cir. 1993).  For these purposes, probable cause is "a fluid concept, turning on the assessment of probabilities in particular factual contexts, not readily, or even usefully, reduced to a neat set of legal

rules." <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983); see also, <u>Ornelas v. United States</u>, 517 U.S. 690, 695 (1996).

"Search warrant '[a]pplications and affidavits should be read with common sense and not in a grudging hyper technical fashion.'" <u>United States v. Ryan</u>, 293 F.3d 1059, 1061 (8th Cir. 2002), quoting <u>United States v. Goodman</u>, 165 F.3d 610, 613 (8th Cir. 1999), cert. denied, 527 U.S. 1030 (1999). In conducting such an examination, the Court should review the Affidavits as a whole, and not on a paragraph-by-paragraph basis. See, <u>United States v. Anderson</u>, 933 F.2d 612, 614 (8th Cir. 1991); <u>Technical Ordnance, Inc. v. United States</u>, 244 F.3d 641, 649 (8th Cir. 2001), cert. denied, 534 U.S. 1084 (2002). Moreover, the reviewing Court must not engage in a <u>de novo</u> review but, rather, should accord great deference to the decision of the Judicial Officer who issued the Warrant. <u>United States v. Maxim</u>, 55 F.3d 394, 397 (8th Cir. 1995), cert. denied, 516 U.S. 903 (1995); <u>United States v. Curry</u>, 911 F.2d 72, 75 (8th Cir. 1990), cert. denied, 498 U.S. 1094 (1991). This mandated deference to the determination of the issuing Judicial Officer is consistent with the Fourth Amendment's sound preference for searches that are conducted pursuant to Warrants. <u>Illinois v. Gates</u>, supra at 236.

2.   <u>Legal Analysis</u>.  On the Record presented, we find that there was adequate probable cause to support the issuance of the Search Warrant for the Defendant's blood sample.  In support for the Search Warrant Application, Branchaud submitted an Affidavit, which detailed the events at Karen's residence, on May 2, 2007, that caused him to believe that evidence of alcohol or drug use would be discovered through the collection of a blood sample from the Defendant.   By that time, Branchaud had confirmed that the truck at the scene of Karen's residence was registered to the Defendant.  In his Affidavit, Branchaud averred that witnesses at the scene had identified the Defendant as the driver of the truck, that had struck Karen and Angela, and caused their injuries and Angela's death.  Branchaud further averred that he smelled a strong odor of alcohol on the Defendant, at the time of her arrest.  The Search Warrant Application, as we have noted, requested authorization to collect a blood sample, in order to assess the Defendant's drug or alcohol use at the time of the incident.

On these averments, we find that there was adequate probable cause to support the issuance of the Search Warrant.[10]   The Defendant contends that the Search

[10]Even if the information in the Search Warrant was insufficient to establish probable cause, we would be compelled, by the law of this Circuit, to find that

Warrant was facially invalid, because it authorized Branchaud to draw a blood sample

from the Defendant, at any time of day or night, prior to March 12, 2007 -- a date

nearly two (2) months before the Search Warrant was issued.[11]  We find, however,

--------

Branchaud's reliance upon the Search Warrant was reasonable, because the Warrant was"not so facially lacking in probable cause as to preclude the executing officers' good faith reliance thereon." United States v. McNeil, 184 F.3d 770, 775 (8th Cir. 1999), citing United States v. Leon, 468 U.S. 897, 922-23 (1984); see also, United States v. Thomas, 263 F.3d 805, 808 (8th Cir. 2001), cert. denied, 534 U.S. 1146 (2002)(applying United States v. Leon to deny a Motion to Suppress, based on a clerical error in the street address of a Search Warrant, because "the responsibility for this type of error in the warrant lies with the issuing judge" and precludes the application of the exclusionary rule).  Accordingly, even if probable cause were lacking, we would still recommend that the Defendant's Motion be denied.

[11]We note that the Defendant has not challenged the Search Warrant on the basis that an inventory return was not executed.  The Government asserts that a return was made, but that it has not yet received a copy of the return to share with the Defendant and the Court.  See, Government's Memorandum in Opposition, supra at 9.  In any event, we agree with the Government that a failure to submit a return, if properly shown, would not warrant suppression in this case.  See, United States v. Hornbeck, 118 F.3d 615, 617-18 (8th Cir. 1997).

In addition, we note that, while at the hospital, the Defendant told Branchaud that she wanted her lawyer to see the Search Warrant.  Nevertheless, the execution of the Search Warrant did not violate the Defendant's Sixth Amendment right to counsel, because that right had not yet attached.  The United States Supreme Court has instructed that the Sixth Amendment right to counsel "does not attach until a prosecution is commenced, that is, at or after the initiation of adversarial judicial criminal proceedings -- whether by way of formal charge. preliminary hearing, indictment, information, or arraignment." McNeil v. Wisconsin, 501 U.S. 171, 175 (1991); see, Fellers v. United States, 540 U.S. 519, 523 (2004); Kirby v. Illinois, 406 U.S. 682, 689 (1972).  In this case, the prosecution of the Defendant had not

that the typographical error does not render the Search Warrant facially invalid.  As signed and dated, the Search Warrant was issued by Judge Amber Ahola of the Red Lake Court of Indian Offenses, at 1:20 o'clock a.m., on May 3, 2007.  Branchaud testified that a Tribal Code Rule required the Search Warrant to be executed within ten (10) days.  Compare, Rule 41(e)(2)(A)(i), Federal Rules of Civil Procedure ("The warrant must command the officer to * * * execute the warrant within a specified time no longer than 10 days[.]").  More importantly, Branchaud testified that the March 12 date was a typographical error, which is corroborated by the face of the Warrant which, concededly, was signed and issued on May 3, 2007.

Presumably, Branchaud and Judge Ahola intended for the Search Warrant to read May 12, 2007, rather than March 12, pursuant to the Tribal Code Rule.  Such a typographical error does not require the application of the exclusionary rule, particularly where we find ample probable cause to support the Search Warrant.  See, United States v. White, 356 F.3d 865, 869 (8th Cir. 2004)(rejecting the defendant's argument that an incorrect date on the face of a Search Warrant, due to a clerical error,

_____

commenced at the time that the Search Warrant was executed, given that she was not yet subject to any formal charges, nor had she made an initial appearance. Accordingly, we reject any challenge to the Search Warrant on the basis of the Sixth Amendment.

rendered the Warrant invalid); <u>United States v. Arenal</u>, 768 F.2d 263, 267 (8th Cir.
1985)(concluding that "obvious typographical errors did not render any of the
warrants invalid.").

Moreover, even if we were to agree with the Defendant, that the typographical
error rendered the Search Warrant facially invalid, the taking of her blood sample
would be admissible, based on the exigent circumstances presented.  There can be no
serious question that the taking of a blood sample, so as to determine its alcohol
content, is subject to the proscriptions of the Fourth Amendment.  As the Supreme
Court explained, in <u>Skinner v. Railway Labor Executives' Ass'n</u>, 489 U.S. 602, 616
(1989):

> Our precedents teach that where, as here, the Government
> seeks to obtain physical evidence from a person, the Fourth
> Amendment may be relevant at several levels. See, e.g.,
> United States v. Dionisio, 410 U.S. 1, 8, 93 S.Ct. 764, 768,
> 35 L.Ed.2d 67 (1973).  The initial detention necessary to
> procure the evidence may be a seizure of the person, Cupp
> v. Murphy, 412 U.S. 291, 294-295, 93 S.Ct. 2000, 2003, 36
> L.Ed.2d 900 (1973); Davis v. Mississippi, 394 U.S. 721,
> 726-727, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969), if the
> detention amounts to a meaningful interference with his
> freedom of movement. INS v. Delgado, 466 U.S. 210, 215,
> 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); United States
> v. Jacobsen, supra, 466 U.S., at 113, n. 5, 104 S.Ct., at
> 1656, n. 5. Obtaining and examining the evidence may also
> be a search, see Cupp v. Murphy, supra, 412 U.S., at 295,

93 S.Ct., at 2003, United States v. Dionisio, supra, 410 U.S., at 8, 13-14, 93 S.Ct., at 768, 771-772, if doing so infringes an expectation of privacy that society is prepared to recognize as reasonable, see, e.g., California v. Greenwood, 486 U.S. 35, 43, 108 S.Ct. 1625, 1630, 100 L.Ed.2d 30 (1988); United States v. Jacobsen, supra, 466 U.S., at 113, 104 S.Ct., at 1656.

We have long recognized that a "compelled intrusio[n] into the body for blood to be analyzed for alcohol content" must be deemed a Fourth Amendment search.  See Schmerber v. California, 384 U.S. 757, 767-768, 86 S.Ct. 1826, 1833-1834, 16 L.Ed.2d 908 (1966). See also Winston v. Lee, 470 U.S. 753, 760, 105 S.Ct. 1611, 1616, 84 L.Ed.2d 662 (1985). In light of our society's concern for the security of one's person, see, e.g., Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968), it is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable.

"The Constitution only protects against 'intrusions that are not justified in the circumstances, or which are made in an improper manner.'" Kruger v. Erickson, 875 F. Supp. 583 (D. Minn. 1995), quoting Schmerber v. California, 384 U.S. 757, 768 (1966).

"Courts must consider 'whether [officials] were justified in requiring [the defendant] to submit to the test, [and] whether the means and procedures employed in taking his blood respected relevant Fourth Amendment standards of

- 31 -

reasonableness.'"   Id., quoting, Schmerber v. California, supra at 768.   "In determining the reasonableness of a search, courts must balance 'the need to search against the invasion which the search entails.'"  McDonell v. Hunter, 809 F.2d 1302, 1307 (8th Cir. 1987), quoting in turn Camara v. Municipal Court, 387 U.S. 523, 537 (1967).  Courts have recognized the reasonableness of drawing blood samples from suspects.  See, United States v. Long Feather, 299 F.3d 915, 918 (8th Cir. 2002)("A defendant can be compelled [] to give a blood sample."), citing, Schmerber v. California, supra at 768.

Regardless of the reasonableness of any search, "[s]earch warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions into the human body are concerned."  Schmerber v. California, supra at 770.  Warrantless searches and seizures are constitutional only if supported by a showing of probable cause and exigent circumstances.  See, Kirk v. Louisiana, 536 U.S. 635, 638 (2002)(noting that "police officers need either a warrant or probable cause plus exigent circumstances."); Welsh v. Wisconsin, 466 U.S. 740, 748 (1984); Payton v. New York, 445 U.S. 573 (1980); United States v. Walsh, 299 F.3d 729, 733 (8th Cir. 2002), cert. denied, 537 U.S. 1066 (2002)("'A warrantless search is reasonable when justified by both probable cause and exigent

circumstances,'" quoting United States v. Parris, 17 F.3d 227, 229 (8th Cir. 1994), cert. denied, 511 U.S. 1077 (1994)); United States v. Ramey, 711 F.2d 104, 106 (8th Cir. 1983)(holding that "the taking of the blood did not violate the defendant's constitutional rights because there was probable cause, the blood sample was a very limited intrusion incident to [the defendant's] hospitalization for medical treatment, and the blood alcohol evidence was in danger of immediate destruction," citing Cupp v. Murphy, 412 U.S. 291, 296 (1973)); Berglund v. City of Maplewood, MN, 173 F. Supp.2d 935 (D. Minn. 2001)(explaining that "there is no need to obtain a warrant if (1) there is probable cause and (2) there are exigent circumstances requiring immediate action.").

The United States Supreme Court has instructed that, "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." Welsh v. Wisconsin, supra at 749-50. But the Court has recognized a small number of these exigent circumstances: "Hot pursuit" of a fleeing felon, see United States v. Santana, 427 U.S. 38, 42-43 (1976); Warden v. Hayden, supra at 298-99, a risk of destruction of evidence, see Schmerber v. California, supra at 770-71 (1966), and threats of violence or danger to human life, Welsh v. Wisconsin, supra at 748; United States v. Ball, 90 F.3d 260, 263 (8th Cir. 1996).

Here, we have already concluded that Branchaud had probable cause for the search and seizure of the Defendant's blood, so as to determine its alcohol content. Given that the alcohol content of blood rapidly dissipates, there is a substantial risk that evidence will be destroyed if not analyzed promptly.   See, Schmerber v. California, supra at 770 (noting that "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system.").   Accordingly, the taking of the Defendant's blood sample, during the early morning of May 3, 2007, was justified by recognized exigent circumstances, so as to preserve evidence that would otherwise be destroyed, and the taking was one which could be accomplished without a Warrant, given the circumstances here, if we had concluded -- which we do not -- that the Warrant was defective.

In sum, we find that the Search Warrant for the Defendant's blood sample was sufficiently supported by probable cause or, alternatively, if a typographical error rendered the Warrant invalid, the taking of the blood sample was justified by exigent circumstances.   Therefore, we recommend that the Defendant's Motion to Suppress Evidence from the Search Warrant for her blood sample be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

- 34 -

1.     That the Defendant's Motion to Suppress Statements, Admissions, and Answers [Docket No. 19] be DENIED.

2.     That the Defendant's Motion to Suppress Evidence [Docket No. 21] be DENIED.

Dated: October 25, 2007                    s/Raymond L. Erickson
                                           Raymond L. Erickson
                                           CHIEF U.S.  MAGISTRATE JUDGE

NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than November 13, 2007**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete

transcript of that Hearing **by no later than November 13, 2007**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.